BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
Michael J. Barrie (admitted *pro hac vice*)
Raymond H. Lemisch (RL5345)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7010 telephone
(302) 442-7012 facsimile

White Plains Center
50 Main Street, Suite 1000
White Plains, NY 10606

*Counsel for Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Empire One Telecommunications, Inc. | : | 10-10987 (ALG) |
| aka EOT, | : | |
| | : | |
| Debtor. | : | EIN: 54-1963388 |

---------------------------------------------------------------x

**MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (A) APPROVING BID AND NOTICE PROCEDURES AND BID PROTECTIONS FOR THE SALE OF THE DEBTOR'S ASSETS; (B) SCHEDULING AN AUCTION; (C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; (D) APPROVING FORM OF <u>NOTICE; AND (E) GRANTING RELATED RELIEF</u>**

The above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>"), by and through its undersigned counsel, hereby moves this Court (the "<u>Motion</u>"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>") and Rule 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure for an Order (a) approving bid and notice procedures and bid protections for the sale of the Debtor's assets, (b)

scheduling an auction, (c) approving assumption and assignment procedures, (d) approving form of notice, and (e) granting related relief. In support of this Motion, the Debtor respectfully states as follows:

## Jurisdiction and Venue

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105(a), 363, 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), and General Order M-383, Amended Guidelines for the Conduct of Asset Sales (the "Guidelines").

## Background

3. On February 25, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its business and manage its property and assets as a debtor-in-possession. No trustee, examiner or official committee of unsecured creditors have been appointed in the Debtor's chapter 11 case.

4. The Debtor is a competitive local exchange carrier under the Telecommunications Act of 1996 and provides various wholesale/retail communications services, including standard voice telecommunications (local, long distance, and wireless), Internet access, and specialized data services for commercial subscribers. The Debtor serves customers in the United States, Asia, and other markets, maintains Web portals in multiple languages, and provides marketing,

sales, and customer services in target markets. The Debtor's staff currently consists of approximately 26 employees.

5. The Debtor derives revenues from, among other sources, access billing, whereby the Debtor receives a per-minute fee for each call routed through its network. To collect these revenues, the Debtor invoices other telecommunications' providers (the "Carriers"), and obtains the Carriers' data on the number and attributes of calls routed through the Debtor's network. Debtor has multiple, ongoing billing disputes with several Carriers.

6. In light of the foregoing disputes, the Debtor was unable to fully collect outstanding receivables from certain Carriers. These disputes, combined with the economic recession that has caused decreased phone demand and reduced customer prices and profit margins, necessitated the Debtor's Chapter 11 filing.

7. The Debtor has continued in possession of its property and has continued to operate and maintain its business as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code

8. No trustee or examiner has been appointed in this Chapter 11 Case, and no official committee of unsecured creditors have yet been appointed or designated.

9. On September 23, 2010, the Debtor filed its Chapter 11 Plan of Liquidation (the "Plan") [Docket No. 74] and accompanying Disclosure Statement (the "Disclosure Statement") [Docket No. 75]. The Disclosure Statement and Plan contemplated the sale of all or substantially all of the Debtor's assets prior to December 31, 2010.

10. On October 27, 2010, this Court entered an Order extending the time period for confirmation of the Debtor's plan under sections 1129(e) and 1121(e)(3) of the Bankruptcy Code

through and including December 31, 2010, without prejudice to the Debtor's rights to seek further extensions [Docket No. 93].

11. On November 1, 2010, the Debtor received an executed letter of intent (the "Letter of Intent") from Lexicon United Inc. (the "Stalking Horse") relating to the purchase of substantially all of the Debtor's assets. The Debtor and the Stalking Horse are currently in the process of revising the Letter of Intent. A copy of the Letter of Intent will be filed with the Court no less than (3) three days prior to the hearing.

12. Under the proposed terms of the sale with the Stalking Horse, the Stalking Horse or its designee will purchase all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code (the "363 Sale").[1] Pursuant to the Stalking Horse Agreement, the Buyer proposes to pay to the Debtor's estate the sum of $1 million and assume certain pre-petition and post-petition liabilities in connection with its purchase of substantially all of the Debtor's assets.

13. The Debtor believes that the value that it will receive from the Stalking Horse constitutes fair market value for its assets and will maximize value to the Debtor's various creditor constituencies and bring a successful conclusion to this Chapter 11 case. Notwithstanding the Stalking Horse Agreement, the Debtor's business and assets will be subject to an expansive marketing effort and the Stalking Horse's bid will be subject to higher or better offers as set forth below.

---

[1] Because the Debtor will sell its assets through the 363 Sale in lieu of a sale pursuant to the Plan, it will file an amended Plan and Disclosure Statement.

14. Accordingly, the Debtor is prepared to proceed with the sale of its business and its assets, subject to higher and better bids, in accordance with the procedures proposed in this Motion.²

**Relief Requested**

15. The Debtor is requesting, pursuant to section 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, entry of an order (the "<u>Bid Procedures Order</u>"), substantially in the form attached hereto as <u>Exhibit A</u> (A) approving the bid procedures for the 363 Sale; (B) scheduling an auction (the "<u>Auction</u>"); (C) approving assumption and assignment procedures (the "<u>Assumption and Assignment Procedures</u>"); (D) approving the form and manner of notice (the "<u>Notice</u>"); and (E) granting related relief.

16. The 363 Sale to the qualified bidder(s) with the highest or otherwise best bid(s) at the Auction (collectively, the "<u>Successful Bidder</u>") as contemplated herein: (i) will maximize the value of the Debtor's estate for the benefit of the Debtor's creditors; (ii) ultimately will lead to confirmation of the Plan under section 1129 of the Bankruptcy Code; and (iii) is in the best interest of the Debtor, its creditors, and its estate. The relief requested in this Motion therefore should be granted.

**I.  The Debtor's Efforts to Sell Substantially All of Its Assets**

17. Since the Petition Date, the Debtor and its advisors have explored various restructuring alternatives, including the sale of all or specific portions of the Debtor's operations. On October 26, 2010, the Debtor filed an Application ("<u>Application</u>") to Retain Phoenix Capital

---

² The Debtor will separately file a motion pursuant to section 363 of the Bankruptcy Code to approve the sale of substantially all of its assets to the Stalking Horse or its designee (the "<u>Sale Motion</u>"). The Sale Motion will disclose any "extraordinary provisions" of the proposed 363 Sale (and the basis therefore) in accordance with the Guidelines.

5

Resources ("Phoenix Capital") as its investment banker to assist the Debtor with the sale process, which is scheduled for presentment before this Court on November 17, 2010.

18. Phoenix Capital will commence a broad marketing campaign for the Debtor exploring the possibility of a sale of all or certain portions of the Debtor's assets.

19. The primary purpose of the sale process will be to provide for the 363 Sale of substantially all of the Debtor's assets and operations (the "Acquired Assets") to the party that submits the highest and best offer in accordance with the bid procedures defined herein.

## II.  The Stalking Horse Agreement, Bid Procedures, Auction, and Sale

### A.  The Stalking Horse Agreement

20. As described above, the Debtor has been in extensive negotiations with the Stalking Horse regarding the terms of a possible sale. These negotiations culminated in an executed letter of intent (currently being revised) and will result in the execution of a definitive agreement (the "Stalking Horse Agreement"). The Letter of Intent provides and the Stalking Horse Agreement will provide that the Buyer will pay $1 million for the Acquired Assets and assume certain pre-petition and post-petition liabilities of the Debtor. The Debtor believes that, subject to the receipt of higher and better proposals through the Bid Procedures, the Stalking Horse Agreement will represent the best alternative currently available to the Debtor.

### B.  The Proposed Bid Procedures and Bid Protections[3]

21. The Bid Procedures, substantially in the form attached as Addendum 1 to the Bid Procedures Order were developed to permit an expedited sale process, to promote participation and active bidding, and to ensure that the Debtor receives the highest and best offer for the

---

[3] The summary of the Bid Procedures contained in this Motion is qualified in its entirety by reference to the Bid Procedures. To the extent of any inconsistency, the Bid Procedures shall govern. Capitalized terms used but not otherwise defined in this section shall have the meanings set forth in the Bid Procedures.

Acquired Assets. Given the Debtor's current cash position and the posture of this case, the Debtor believes that the timeline for consuming the sale process established pursuant to the Bid Procedures is in the best interests of the estate and all parties in interest.

22. The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline requirements for submitting a competing bid, the method and factors for determining qualifying bids, the criteria for selecting a successful bidder, and provides for certain stalking horse bid protections (the "Stalking Horse Bid Protections") for the benefit of the Buyer.

23. The Stalking Horse Bid Protections are a material inducement for, and condition of, the Buyer's agreement to enter into the Stalking Horse Agreement. As described in detail below, the Debtor believes that the Stalking Horse Bid Protections are fair and reasonable and will enhance the prospects for competitive bidding with respect to the Acquired Assets.

24. Set forth below is the general process to be employed by the Debtor with respect to the proposed 363 Sale of the assets identified in the Stalking Horse Agreement (the "Acquired Assets").[4]

    a. **Assets to Be Sold.** The Debtor is offering the Acquired Assets for sale pursuant to Section 363 of the Bankruptcy Code. The Debtor shall retain all rights and title to assets that are not subject to a bid accepted by the Debtor and approved by the Bankruptcy Court at the Sale Hearing. A Qualified Bidder may also submit a bid that includes assets of the Debtor that are not defined as Acquired Assets in the Stalking Horse Agreement (the "Other Assets" and, together with the Acquired Assets, the "Assets").

    b. **The Bidding Process.** The Debtor, in conjunction with its advisors, shall: (i) determine whether any person is a Potential Bidder (hereinafter defined); (ii) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Debtor's business; (iii) receive offers from Qualified Bidders (hereinafter defined); and (iv)

---

[4] A copy of the Stalking Horse Agreement will be annexed to the Sale Motion, which the Debtor intends to file by December 15, 2010.

negotiate any offer made to purchase the Assets, together or separately (collectively, the "Bidding Process"). Neither the Debtor nor its representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

c. **Participation Requirements.** Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtor, in order to participate in the Bidding Process each person (a "Qualified Bidder") must submit a bid that adheres to the following requirements (a "Qualified Bid"):

1. All Qualified Bids must be submitted to: (i) Michael J. Barrie of Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, and (ii) Adam S. Cook, Phoenix Capital Resources, 5 Penn Plaza, 23rd Floor, New York, NY 10001, not later than 5:00 p.m. (prevailing Eastern Time) on January 7, 2011 (the "Bid Deadline").

2. All Qualified Bids shall be in the form of an offer letter from a person or persons that the Debtor deems financially able to consummate the purchase of the Assets, which letter states:

    (a) that such Qualified Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed asset purchase agreement (hard copy and an electronic version in Word format and blacklined against the Stalking Horse Agreement), together with its exhibits and schedules, including terms relating to price and the time of closing (the "Proposed Agreement");

    (b) that such Qualified Bidder is prepared to consummate the transaction on or before January 31, 2011, following entry of an order of this Court approving the Sale to the Successful Bidder (the "Sale Order");

    (c) that such Qualified Bidder's offer is irrevocable until the earlier to occur of January 31, 2011 or two (2) business days after the closing of the 363 Sale of the Acquired Assets;

    (d) the actual value of such Qualified Bidder's bid to the Debtor's estate; and

(e) which of the Debtors' leases and executory contracts are to be assumed in connection with the consummation of the Qualified Bidder's bid.

(f) All Qualified Bids shall be accompanied by a deposit into escrow with the Debtor of an amount equal to ten percent (10%) of consideration offered by the Qualified Bidder for the Acquired Assets (the "Good Faith Deposit").

(g) All Qualified Bids shall be accompanied by satisfactory evidence, in the opinion of the Debtor and its advisors, of committed financing or other ability to perform all transactions contemplated by the Proposed Agreement.

(h) All Qualified Bids must provide for funding of all payments required under the Plan.

(i) All Qualified Bids must identify the proposed management team of the Qualified Bidder.

(j) Qualified Bids cannot contain any financing conditions or contingencies (other than those that may be set forth in the Stalking Horse Agreement).

(k) All Qualified Bids must provide for adequate workers' compensation insurance coverage and for adequate working capital financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

(l) All Qualified Bidders must provide such additional information deemed appropriate by the Debtor's management, in its sole and absolute discretion, to demonstrate that the Qualified Bidders have the financial wherewithal to close on the 363 Sale.

d. **Due Diligence.** The Debtor shall afford each Potential Bidder (hereinafter defined) due diligence access to the Acquired Assets. Due diligence access may include management presentations as may be scheduled by the Debtor, access to data rooms, on site inspections and such other matters which a Potential Bidder may request and as to which the Debtor, in its sole discretion, may agree. Neither the Debtor nor any of its affiliates (nor any of its respective representatives) are obligated to furnish any information relating to the Acquired Assets to any person except to

Potential Bidders. Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than the Debtor or its representatives. To be a "<u>Potential Bidder</u>," each bidder must have delivered the following:

    (a)    an executed confidentiality agreement in form and substance satisfactory to the Debtor; and

    (b)    current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtor and its advisors in their sole discretion, demonstrating such Potential Bidder's ability to close the proposed transaction, to fund the Plan, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

e.    **"As Is, Where Is."**  The sale of the Acquired Assets or the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or estate, except to the extent set forth in the Proposed Agreement of the Successful Bidder. Except as otherwise provided in the Proposed Agreement, all of the Debtor's right, title and interest in and to the Assets to be acquired shall be sold pursuant to section 363 of the Bankruptcy Code free and clear of all liens, claims, charges, security interests, restrictions and other encumbrances of any kind or nature thereon and there against (collectively, the "<u>Transferred Liens</u>"), with such Transferred Liens to be satisfied in accordance with the terms of the sale order. Each bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection with the Acquired Assets, the Bidding Process or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, in the applicable Proposed Agreement.

f. **Stalking Horse.** The Stalking Horse has submitted a Qualified Bid pursuant to the Stalking Horse Agreement, which Qualified Bid shall serve as a stalking horse bid (the "Stalking Horse Bid").

g. **Stalking Horse Bid Protections**: The Debtor seeks court authority to: (i) provide a break-up fee in the amount of $30,000 to the Stalking Horse, payable in the event that an alternative transaction closes and the Stalking Horse is not the Successful Bidder; and (ii) provide that any competing Qualified Bids must exceed the aggregate consideration to be paid to or for the benefit of the Debtor's estate as set forth in the Stalking Horse Bid by at least $70,000.

h. **Credit Bid**: The Debtor has no secured creditor(s). As such, no holder of a lien on any assets of the Debtor shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code.

i. **Auction.** If the Debtor receives more than one Qualified Bid prior to the Bid Deadline, the Debtor shall conduct an auction (the "Auction") on January 14, 2011 at 10:00 (ET) a.m. at the law offices of Goldberg & Rimberg PLLC, 115 Broadway, 3rd Floor, New York, New York 10006 or such later time or other place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. Only representatives of the Stalking Horse, the Debtor and any Qualified Bidders along with their professionals who have timely submitted Qualified Bids shall be entitled to attend the Auction. The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with these Bidding Procedures. Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtor determines is relevant, the Debtor, in its sole discretion, may conduct the Auction in the manner it determines will achieve the maximum value for the Acquired Assets. At the Auction, the minimum initial bid against the Stalking Horse bid must exceed the value of the Stalking Horse bid by $70,000. Subsequent bids shall be made in minimum increments of $25,000. The Stalking Horse will receive a "credit" equal to the break-up fee in subsequent rounds of bidding.

As soon as practicable after the conclusion of the Auction, the Debtor shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the 363 Sale and confirming the Plan; and (ii) identify the highest or otherwise best offer or combination of offers for the Assets and any second-highest offer (the "Successful Bid") of the prevailing bidder ("Prevailing Bidder").

The Debtor reserves all rights to not submit any bid which is not acceptable to the Debtor.

If an Auction is conducted, the party with the next highest or otherwise best Bid (including for this purpose, the Buyer), as determined by the Debtor, in the exercise of its business judgment, shall be required to serve as a back-up bidder (the "<u>Back-Up Bidder</u>") and keep such bid (the "<u>Back-Up Bid</u>") open and irrevocable to the earlier of (i) January 31, 2011 or (ii) the closing of the Sale.

j. **<u>Acceptance of Qualified Bids.</u>** The Debtor shall sell the Assets for the highest and otherwise best bid received as determined by the Debtor pursuant to the Bidding Procedures and approved by the Bankruptcy Court. The Debtor's presentation to the Bankruptcy Court for approval of a particular bid does not constitute the Debtor's acceptance of a bid. The Debtor will be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

k. **<u>The Sale Hearing.</u>** The Debtor is requesting that the Sale Hearing take place no later than January 19, 2011. The Debtor intends to file a separate Sale Motion with the Court seeking approval of the 363 Sale, the nature of the relief requested and disclosing any "extraordinary provisions" in accordance with the Guidelines. Objections, if any, to the Sale will be required to be filed in the Bankruptcy Court and served so as to be received by January 12, 2011. The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

l. **<u>Return of Good Faith Deposit.</u>** Upon entry of the Sale Order, the Deposits of all Qualified Bidders, other than the Prevailing Bidder and the Back-Up Bidder, shall be returned to such Qualified Bidders. The Deposits of the Prevailing Bidders and the Back-Up Bidder shall be held in escrow until 60 days after the date that the Prevailing Bidder is required to close.

m. **<u>Modifications.</u>** The Debtor may: (i) determine, in its business judgment, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) reject at any time before entry of the Sale Order approving a Qualified Bid, any bid that, in the Debtor's sole discretion, is: (x) inadequate or insufficient; (y) not in conformity with the requirements of the Bankruptcy Code; the Bidding Procedures, or the terms and conditions of sale; or (z) contrary to the best interests of the Debtor, its estate, its creditors and other parties in interest

n. **<u>Reservation of Rights</u>**: In addition to its rights set forth in sections (i.) and (m.) above, the Debtor may modify these Bid Procedures or impose,

at or prior to the Auction, additional terms and conditions on the proposed Sale of the Acquired Assets if, in its reasonable judgment, such modifications would be in the best interests of the Debtor's estate and promote an open and fair sale process.

C. **The Auction and Sale**

25. If more than one Qualified Bid is received by the Bid Deadline (other than the Stalking Horse Agreement), the Debtor will conduct an auction (the "Auction") to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate, including, inter alia, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities, if any; (iii) the ability of the Qualified Bidder to close the proposed Transaction; (iv) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (v) any purchase price adjustments; (vi) the impact of the Transaction on any actual or potential litigation; and (vii) the net after-tax consideration to be received by the Debtor's estate (collectively, the "Bid Assessment Criteria"). Nothing herein shall be deemed to limit the Debtor to the Bid Assessment Criteria set forth herein. If no Qualified Bid (other than the Stalking Horse Agreement) is received by the Bid Deadline, the Debtor may determine not to conduct the Auction. The Debtor seeks authority from the Court to schedule the Auction for January 14, 2011, as set forth in the Bid Procedures.

D. **The Proposed Assumption and Assignment Procedures**

26. To facilitate and effect the 363 Sale of the Debtor's assets to the Successful Bidder, the Debtor seeks authorization to assume and assign certain contracts and unexpired leases in connection with the 363 Sale. In order to provides counterparties with adequate notice of such assumption and proposed cure amounts (the "Cure Amounts"), the Debtor proposes the

following procedures (the "Assumption and Assignment Procedures"), which are attached as Addendum 2 to the proposed Bid Procedures Order.

    a. Within ten (10) days prior to the Bid Deadline, the Debtor shall file a schedule of cure obligations (the "Contract & Cure Schedule") listing all leases and executory contracts that the Stalking Horse intends to assume (the "Assigned Contracts") and the amount, if any, that the Debtor contends is the amount needed to cure any defaults with respect to such Assigned Contracts (the "Cure Amounts").

    b. Upon filing, a copy of the Contract & Cure Schedule and these Assumption & Assignment Procedures will be served on each of the counterparties to the Assigned Contracts listed on the Contract & Cure Schedule.

    c. The Debtor shall amend the Contract & Cure Schedule promptly after the completion of the Auction to update the information contained therein with respect to the Successful Bid(s), and shall serve an amended Contract & Cure Schedule on each of the counterparties to the Assigned Contracts listed thereon.

    d. Any objections ("Assignment Objections") to the assumption and assignment of any Assigned Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the cure amount set forth in the Contract & Cure Schedule must be filed with the Bankruptcy Court and served upon the Notice Parties on or before 4 p.m. prevailing Eastern Time on January 12, 2011 (the "Assignment Objection Deadline").

    e. Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from (i) objecting to the Cure Amount set forth on the Contract & Cure Schedule with respect to its Assigned Contract; (ii) seeking additional amounts arising under its Assigned Contract prior to the Closing from the Debtor or the Successful Bidder; and (iii) objecting to the assumption and assignment of its Assigned Contract to the Successful Bidder.

    f. Any Assignment Objections not consensually resolved prior to the Sale Hearing shall be heard at the Sale Hearing with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Assigned Contracts will be heard at the Sale Hearing.

    g. Except as may otherwise be agreed to by all parties to an Assigned Contract, on or before the Closing, the cure of any defaults under

> Assigned Contracts necessary to permit assumption and assignment thereof shall be by (i) payment of the undisputed Cure Amount, and/or (ii) establishment of a reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the Proposed Agreement between the Successful Bidder and the Seller.

27. The Debtor believes that the proposed Assumption and Assignment Procedures will provide the counterparties to the Assumed Contracts with a full and fair opportunity to be heard with respect to issues concerning Cure Amounts and proposed assumption and assignment of the Assumed Contracts.

## Basis for Relief

### I. The Bid Procedures Are Appropriate and in the Best Interests of the Debtor, Its Estate and Its Creditors

#### A. The Proposed Notice of the Bid Procedures Is Appropriate.

28. The Debtor seeks to sell the Acquired Assets through a 363 Sale and Auction. The Debtor and Phoenix Capital have commenced and will continue to conduct an extensive marketing campaign. Moreover, the Debtor, with the assistance of Phoenix Capital, is developing a list of Contact Parties who will receive a copy of an information package prepared by Phoenix Capital with the assistance of the Debtor. The list of Contact Parties is specifically designed to encompass those parties who the Debtor believes may be potentially interested in pursuing a Transaction and who the Debtor reasonably believes may have the financial resources to consummate a Transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Acquired Assets, maximizing the value for the Debtor's estate and its creditors.

29. Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Acquired Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

30. Therefore, in addition to the Contact Parties, the Debtor will serve this Motion on all Notice Parties (as defined herein) and will provide notice, substantially in the form of Addendum 3 to the Bid Procedures Order (the "Notice"), of the hearing on this Motion to all entities who are currently known to possess or assert a claim against the Debtor.

31. The Debtor believes that the foregoing notice is sufficient to provide effective notice of the Bid Procedures and the Auction to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Debtor's marketing process, while minimizing costs to the estate. Accordingly, the Debtor respectfully requests that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the Bid Procedures or the Auction is required.

**B.    The Bid Procedures Are Appropriate and Will Maximize Value.**

32. This Court has authority to approve the bid procedures. Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. See In re Edwards, 228 B.A. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

33. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See e.g., Official Committee of Subordinated Bondholders v. Integrated Resources Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that overbid procedures and break-up fees that have been negotiated by a debtor are to be reviewed accordingly to the deferential "business judgment" standard, under which procedures and arrangements are presumptively valid). See In re Mushroom Transp. Co., Inc., 382 F.3d 325 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics. Corp v.

Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

34. To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See In re O'Brien Envtl. Energy. Inc., 181 F.3d 527, 537 (3d Cir. 1999); see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding ... maximize the value of the debtor's assets").

35. The Debtor believes that the Bid Procedures will establish the parameters under which the value of the Transaction may be tested at the Auction. The Bid Procedures will increase the likelihood that the Debtor will receive the greatest possible consideration because it will ensure a competitive and fair bidding process.

36. The Debtor also believes that the Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Acquired Assets. The Bid Procedures will allow the Debtor to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a Transaction. The Debtor believes that the Bid Procedures will encourage bidding, that they are consistent with other procedures previously approved by courts in this and other districts and that the Bid Procedures are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. See Integrated Resources, 147 B.R. at 659; In re 995 Fifth Ave., Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989); see also In re O'Brien Envtl. Energy,

17

Inc., 181 F.3d at 537; see also In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. July 14, 2007); In re New Century TRS Holdings. Inc., Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007); In re Three A's Holdings, L.L.C., Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006).

37. Thus, the Bid Procedures are reasonable, appropriate and within the Debtor's sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtor's estate.

    **C.**    **The Initial and Subsequent Overbids Are Appropriate**

38. One important component of the Bid Procedures is the "overbid" provision. Once the Debtor determines the Auction Baseline Bid and holds the Auction, all subsequent Overbids must be made in increments of at least $70,000 higher than the Stalking Horse bid (the "Initial Minimum Overbid") and then continue in minimum increments of at least $25,000 ("Subsequent Overbids"); provided that the Debtor shall retain the right to modify the bid increment requirements at the Auction.

39. The Debtor believes that such Initial Minimum Overbid is reasonable under the circumstances, and will enable the Debtor to maximize the value for such assets while limiting any chilling effect in the marketing process. The overbid increment is also consistent with such increments previously approved by courts in this District.

    **D.**    **The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate.**

40. As part of the Transaction, the Debtor also seeks authority under sections 105(a) and 365 to assume and assign the Assigned Contracts to the Successful Bidder upon closing of the 363 Sale. The Bid Procedures specify the process by which the Debtor will serve Cure and

Possible Assumption and Assignment Notices and the procedures and deadline for counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

41. Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Transaction, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (a) payment of the undisputed cure amount (the "Cure Amount") and/or (b) reserving amounts with respect to any disputed cure amounts.

## No Prior Request

42. No prior motion for the relief requested herein has been made to this or any other court.

## Notice

43. The Debtor has provided this Motion and notice of this Motion to: (i) the Office of the United States Trustee; (ii) all parties who have filed an appearance in this case; (iii) all persons who have expressed an interest in the Assets; and (iv) all entities who are known to possess or assert a claim against the Debtor. Notice of this Motion and any order entered hereon will be served in accordance with the Local Rules. In light of the nature of the relief requested, the Debtor respectfully submits that no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests (A) entry of the Bid Procedures Order, and (B) such other and further relief as is just and proper.

Dated: November 10, 2010

BENESCH FRIEDLANDER
  COPLAN & ARONOFF LLP

By:   /s/ *Michael J. Barrie*
Raymond H. Lemisch (RL5345)
Michael J. Barrie (admitted *pro hac vice*)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7010 telephone
(302) 442-7012 facsimile

White Plains Center
50 Main Street, Suite 1000
White Plains, NY 10606

*Counsel for the Debtor and
Debtor in Possession*