BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
Michael J. Barrie (admitted *pro hac vice*)
Raymond H. Lemisch (RL5345)
222 Delaware Avenue, Suite 801
Wilmington, DE  19801
(302) 442-7010  telephone
(302) 442-7012  facsimile

White Plains Center
50 Main Street, Suite 1000
White Plains, NY 10606

*Counsel for Debtor and Debtor in
Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Empire One Telecommunications, Inc. | : | 10-10987 (ALG) |
| aka EOT, | : | |
| | : | |
| Debtor. | : | EIN:  54-1963388 |

-------------------------------------------------------------x

**MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) APPROVING AN ASSET
PURCHASE AGREEMENT BETWEEN THE DEBTOR AND THE STALKING HORSE,
OR SUCH OTHER PURCHASE AGREEMENT BETWEEN THE DEBTOR AND THE
PREVAILING BIDDER; (II) AUTHORIZING THE SALE OF ALL OR
SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (III)
AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
THEREWITH; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its

undersigned counsel, hereby moves this Court (the "Motion"), pursuant to sections 105(a), 363,

and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code")

and Rule 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure for an Order (i)

approving an asset purchase agreement between the Debtor and the Stalking Horse, or such purchase agreement between the Debtor and the Prevailing Bidder; (ii) authorizing the sale of all or substantially all of the assets of the Debtor free and clear of all liens, claims, encumbrances and other interests; (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and (iv) granting related relief.  In support of this Motion, the Debtor respectfully states as follows:

## Jurisdiction and Venue

1.	This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.	The statutory predicates for the relief requested herein are sections 105(a), 363, 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), and General Order M-383, Amended Guidelines for the Conduct of Asset Sales (the "Guidelines").

## Background

**I.	The Debtor's Bankruptcy Case.**

3.	On February 25, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its business and manage its property and assets as a debtor-in-possession.   No trustee, examiner or official committee of unsecured creditors have been appointed in the Debtor's chapter 11 case.

4.     The Debtor is a competitive local exchange carrier under the Telecommunications Act of 1996 and provides various wholesale/retail communications services, including standard voice telecommunications (local, long distance, and wireless), Internet access, and specialized data services for commercial subscribers.  The Debtor serves customers in the United States, Asia, and other markets, maintains Web portals in multiple languages, and provides marketing, sales, and customer services in target markets.  The Debtor's staff currently consists of approximately 26 employees.

5.     The Debtor derives revenues from, among other sources, access billing, whereby the Debtor receives a per-minute fee for each call routed through its network.  To collect these revenues, the Debtor invoices other telecommunications' providers (the "Carriers"), and obtains the Carriers' data on the number and attributes of calls routed through the Debtor's network. Debtor has multiple, ongoing billing disputes with several Carriers.

6.     In light of the foregoing disputes, the Debtor was unable to fully collect outstanding receivables from certain Carriers.  These disputes, combined with the economic recession that has caused decreased phone demand and reduced customer prices and profit margins, necessitated the Debtor's Chapter 11 filing.

7.     On September 23, 2010, the Debtor filed its Chapter 11 Plan of Liquidation (the "Plan") [Docket No. 74] and accompanying Disclosure Statement (the "Disclosure Statement") [Docket No. 75].  The Disclosure Statement and Plan contemplated the sale of all or substantially all of the Debtor's assets prior to December 31, 2010.

8.     On October 27, 2010, this Court entered an Order extending the time period for confirmation of the Debtor's plan under sections 1129(e) and 1121(e)(3) of the Bankruptcy Code through and including December 31, 2010, without prejudice to the Debtor's rights to seek

further extensions [Docket No. 93] to allow for confirmation of a plan providing for the sale of all or substantially all of the Debtor's assets prior to the expiration of the deadline imposed by the Bankruptcy Code.[1]

## II.    The Sale of All or Substantially All of the Debtor's Assets.

9.      Since the Petition Date, the Debtor and its advisors have explored various restructuring alternatives, including the sale of all or specific portions of the Debtor's operations. In connection therewith, on October 26, 2010, the Debtor filed an Application to retain Phoenix Capital Resources ("Phoenix Capital") as its investment banker to assist the Debtor with a sale process, and an Order was subsequently entered approving the employment of Phoenix Capital on November 17, 2010 [Docket No. 106].   As the Debtor will show at the hearing on this Motion, Phoenix Capital has commenced, and will continue to conduct through the time of the auction, an expansive marketing campaign in connection with the sale of the Debtor's assets.

10.      On November 1, 2010, the Debtor received an executed letter of intent (as revised, the "Letter of Intent") from Lexicon United Inc. ("Lexicon") relating to the purchase of substantially all of the Debtor's assets.  The Debtor and Lexicon revised the Letter of Intent, as reflected by the executed Letter of Intent dated November 12, 2010. Subsequent to the execution of the Letter of Intent, Lexicon and its designee, Media 3 Communications, Inc. (the "Stalking Horse") negotiated the terms of an asset purchase agreement (the "Stalking Horse Agreement"). The primary purpose of the Stalking Horse Agreement and the resulting sale process will be to

---

[1]    As counsel informed the Court of its intent to do so at the December 1, 2010 status conference, the Debtor filed a Second Motion seeking extension of the time period for confirmation of the Debtor's plan under sections 1129(e) and 1121(e)(3) of the Bankruptcy Code through and including February 28, 2011 [Docket No. 111], which is scheduled for presentment on December 20, 2010 at noon.

provide for the sale (a "363 Sale") involving substantially all of the Debtor's assets and the assumption of certain liabilities.

11.　　Notwithstanding the execution of the Stalking Horse Agreement, the Debtor's business and assets have been, and will continue to be, (i) subject to an expansive marketing effort by Phoenix Management, and (ii) the Stalking Horse's bid will be subject to higher or better offers in accordance with the Order entered on December 3, 2010 (the "Bid Procedures Order") [Docket No. 109], in connection with the Debtor's Motion for Entry of an Order (A) Approving Bid and Notice Procedures and Bid Protections for the Sale of the Debtor's Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures; (D) Approving Form of Notice and (E) Granting Related Relief (the "Bid Procedures Motion") [Docket No. 96].

**III.　　The Stalking Horse Agreement, the Bid Procedures, Auction, and Sale.**

**A.　　The Stalking Horse Agreement**

12.　　As described above, the Debtor has been in extensive negotiations with Lexicon and, eventually, the Stalking Horse, regarding the terms of an acquisition of substantially all of the Debtor's assets. These negotiations culminated in the execution of the Stalking Horse Agreement, attached hereto as Exhibit A.[2]

13.　　Under the proposed terms of the sale with the Stalking Horse, the Stalking Horse will purchase all or substantially all of the Debtor's assets ("Assets"), pursuant to section 363 of the Bankruptcy Code (the "363 Sale").[3]　Pursuant to the Stalking Horse Agreement, the Stalking Horse proposes to (i) pay to the Debtor's estate the sum of $800,000 and (ii) assume certain pre-

---

[2]　The Schedules and Exhibits to the Agreement will be filed on or before December 22, 2011.
[3]　Because the Debtor will sell its assets through the 363 Sale in lieu of a sale pursuant to the Plan, it will file an amended Plan and Disclosure Statement.

petition and post-petition liabilities up to $600,000 (but not exceeding more than $400,000 at Closing) as outlined in detail in the Stalking Horse Agreement.

14.     The Debtor believes that the value that it will receive from the Stalking Horse constitutes fair market value for its Assets and will maximize value to the Debtor's various creditor constituencies and bring a successful conclusion to this Chapter 11 case. The Debtor's estate will receive $800,000, plus the assumption of liabilities up to $600,000. The Debtor believes that, subject to the receipt of higher and better proposals in accordance with the Bid Procedures Order, the Stalking Horse Agreement represents the best alternative currently available to the Debtor. Moreover, this transaction will be beneficial in that it will allow most (if not all) of the Debtor's employees to retain their jobs and also allow for the continuity of telecommunications services to an underserved customer base.

**B.     The Bid Procedures[4]**

15.     The bid procedures, a copy of which are attached hereto as <u>Exhibit B</u> (the "<u>Bid Procedures</u>"), were developed to permit a sale process that promotes participation and active bidding, and ensures that the Debtor receives the highest and best offer for the Assets.

16.     The Bid Procedures Order and Bid Procedures provides for the following in connection with the 363 Sale:

| Qualified Bid Deadline | January 7, 2011 |
|---|---|
| Auction | January 14, 2011 |
| Sale Hearing | January 19, 2011 |

---

[4]     The summary of the Bid Procedures contained in this Motion is qualified in its entirety by reference to the Bid Procedures. To the extent of any inconsistency, the Bid Procedures shall govern. Capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the Bid Procedures, unless otherwise noted.

| Closing | January 31, 2011, as set forth in the Stalking Horse Agreement or such other agreement entered into with a Prevailing Bidder |
|---|---|

17.     Accordingly, the Debtor is prepared to proceed with the sale of its business and its assets to the Stalking Horse, subject to higher and better bids, in accordance with the Bid Procedures, upon entry of an order approving this Motion.

<div align="center">**Relief Requested and Applicable Authority**</div>

**I.     Approval of the 363 Sale Is Appropriate and in the Best Interest of the Debtor's Estate.**

**A.     The Sale of the Assets is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtor's Business Judgment.**

18.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, the Second Circuit has required that such use, sale or lease be based upon the sound business judgment of the debtor. See The Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); The Comm. of Equity Sec. Holders v. The Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business). In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." The Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. May 5, 1986).

19. The business judgment rule shields a debtor's management from judicial second-guessing. See Johns-Manville Corp., 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" The Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

20. The Debtor submits that the Stalking Horse Agreement or, as the case may be, a purchase agreement with a Prevailing Bidder, will constitute the highest and best offer for the Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to sell the Assets through an Auction process and seek approval of the Stalking Horse Agreement with the Stalking Horse (or, alternatively, approval of a purchase agreement with the Prevailing Bidder) is a valid and sound exercise of the Debtor's business judgment, as it will provide substantial benefit to the Debtor's estate through (i) the receipt of $800,000 and the assumption of liabilities up to $600,000; (ii)

retention of the jobs for most (if not all) of the Debtor's employees; and (iii) continuity of telecommunications services to the Debtor's customer base. The Debtor will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtor requests that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtor's business judgment and is rightly authorized.

**B.      The Sale of the Assets Free and Clear of Claims and Interests Is Authorized by Section 363(1) of the Bankruptcy Code.**

21.     The Debtor submits that it is appropriate to sell the Assets free and clear of all liens, claims,[5] encumbrances and all other interests, if any, pursuant to section 363(f) of the Bankruptcy Code, with any such interests attaching to the net sale proceeds, as and to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, encumbrances and all other interests if:  (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

22.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]."  11 U.S.C. § 105(a).

---

[5]  The term "liens" includes all liens, liabilities and claims (as such term is defined in section 101 of the Bankruptcy Code) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise, charges, pledges, security interests, conditional sales agreements or other title retention agreements, leases, mortgages, options or other encumbrances (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction of similar statute, as applicable).

23.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens, claims, encumbrances and all other interests. <u>In re Dundee Equity Corp.</u>, 1992 WL 53743, *4 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); <u>In re Bygraph, Inc.</u>, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. Jan. 10, 1986) (same); <u>Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)</u>, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that a court may approve a sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

24.     First, the Debtor is unaware of any party maintaining a security interest in any of the Assets.[6]  In addition, the Debtor believes that several of the provisions of section 363(f) of the Bankruptcy Code will be satisfied with respect to the transfer of the Assets pursuant to the Stalking Horse Agreement or, as the case may be, a purchase agreement with a Prevailing Bidder.  In particular, the Debtor believes that section 363(f)(2), (3), (4), and/or (5) of the Bankruptcy Code will be met in connection with the 363 Sale.

25.     Moreover, parties in interest may assert liens, claims, encumbrances or other interests in, to or against the Assets, any such parties will be adequately protected by having their liens, claims, encumbrances or other interests, if any, attach to the proceeds of the 363 Sale, in the same order of priority, with the same validity, force and effect that such parties had prior to

---

[6]   The Debtor's prepetition lender, EOT Lending Group, was mistakenly scheduled by the Debtor as having a secured claim.  This creditor has not filed any financing statements against the Debtor and, therefore, is unsecured.  The Debtor is in the process of amending its prepetition schedules to reflect this reality.

the 363 Sale, subject to any claims and defenses that the Debtor and its estate may possess with respect thereto.

### C. The Assets Should be Sold Free and Clear of Successor Liability.

26. Under the terms of the Stalking Horse Agreement, the Stalking Horse shall not be liable for any liabilities as a successor to the Debtor's business. Such a provision ensures that the Stalking Horse or the Prevailing Bidder is protected from any claims or lawsuits premised on the theory that the Stalking Horse or the Prevailing Bidder is a successor to the Debtor as a result of a consolidation merger or de facto merger of the Stalking Horse or the Prevailing Bidder and the Debtor. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from the successor liability relating to the debtor's business. See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. May 31, 2009) ("...state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.") aff'd, 576 F.3d 108 (2d Cir. Aug. 5, 2009); In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003) (holding that section 363(f) permits sales free and clear of successor liability); The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. April 19, 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); New England Fish Co. v. Alaska Pacific Consortion (In re New England Fish Co.), 19 B.R. 323, 329 (Bankr. W.D. Wash. April 5, 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's

employees); <u>American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)</u>, 56 B.R. 186, 190 (Bankr. N.D. Ga. Jan. 7, 1986) (product liability claims on successor doctrine precluded in a sale of assets free and clear).  The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.

27.     Accordingly, consistent with the above-cited case law, the order approving the sale of the Assets should state that the Stalking Horse or, as the case may be, the Prevailing Bidder is not liable as a successor under any theory of successor liability, for claims or interests that encumber or relate to the Assets.

> **D.     The Stalking Horse or the Prevailing Bidder is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer and Sale of the Assets Does Not Violate Section 363(n) of the Bankruptcy Code**

28.     The Debtor seeks a finding by the Court that the Stalking Horse or the Prevailing Bidder is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. <u>See</u> <u>Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)</u>, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); <u>see also</u> <u>In re Angelika Films, 57th, Inc.</u>, 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); <u>In re Bakalis</u>, 220 B.R. 525, 537 (Bankr. E.D.N.Y. Feb 26, 1998).

29.     The Stalking Horse and the Debtor have engaged in thorough arms' length negotiations over the terms of the Stalking Horse Agreement.[7]  Similarly, in the event someone other than the Stalking Horse is the Prevailing Bidder, by the time of execution of an agreement between the Debtor and the Prevailing Bidder, the Debtor and the Prevailing Bidder will have engaged in thorough arms' length negotiations over the terms of such agreement. In addition, both the Stalking Horse or any Prevailing Bidder will have complied with the terms and conditions of the Bid Procedures Order.

30.     Moreover, there will be absolutely no fraud or improper insider dealing of any kind. The Debtor will ensure that the Stalking Horse Agreement or, as the case may be, a purchase agreement with the Prevailing Bidder, does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Stalking Horse or the Prevailing Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code. Accordingly, the Debtor requests that the Court make a finding at the Sale Hearing that the Stalking Horse Agreement or, as the case may be, a purchase agreement with the Prevailing Bidder, was at arms' length and is entitled to the full protections of section 363(m) of the Bankruptcy Code. The Debtors will submit evidence at the Sale Hearing to support these conclusions.

31.     Moreover, the Debtor is seeking relief from section 1146(c) of the Bankruptcy Code.  Under section 1146(c), the "making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  11 U.S.C. § 1146(c).  The Debtor is seeking this Court's approval of the 363 Sale to obtain the highest and best possible return for the Debtor's creditors and thereby

_____

[7]   The Debtor has disclosed below the significant terms of all agreements and connections between the Debtor's management and the Stalking Horse.

ultimately facilitate the formulation and confirmation of the Debtor's Plan. The Debtor submits that the 363 Sale is a necessary and integral step toward a plan and confirmation thereof and, accordingly, the transfer should be exempt from any stamp or similar tax under section 1146(c) of the Bankruptcy Code in any jurisdiction in which the Debtor holds assets. <u>See</u> <u>In re Beulah Church of God in Christ Jesus, Inc.</u>, 316 B.R. 41 (Bankr. S.D.N.Y. 2004). The Debtor's Plan as originally filed, and will subsequently be amended, will incorporate this transaction.

**II.    Assumption and Assignment of the Assigned Contracts Is Authorized by Section 365 of the Bankruptcy Code.**

32.    The Stalking Horse Agreement contemplates the assumption and assignment of certain executory contracts and unexpired leases, and the Bid Procedures Order outlines the procedures for assumption and assignment.

33.    Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:  (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —

(A)    cures or provides adequate assurance that the trustee will promptly cure, such default . . .;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

34. The standard applied by certain of the circuits, including the Second Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See In re Wireless Data, Inc., 547 F.3d 484, 488 (2d Cir. 2002); see Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

35. Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. May 20, 2002); The Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330 B.R. 67, 75 (Bankr. D. Del. Aug. 29, 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. April 3, 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); see also Phar-Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio Jan. 13, 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[8]

36. In the present case, the Debtor's assumption and assignment of the Assigned Contracts to the Stalking Horse or the Prevailing Bidder will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code. As discussed

---

[8] Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contracts consent." In re Network Access Solutions. Corp., 330 B.R. at 74 (citations omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to . . . modify contracts [t]o the extent they are outside the ordinary course of business, court approval is necessary." Id. Regardless, "[t]here is . . . no discernable difference in the notice requirements or standard for approval under section 363 and 365." Id.

above, the transactions contemplated by the Stalking Horse Agreement will provide significant benefits to the Debtor's estate. Because the Debtor may not be able to obtain the benefits of the Stalking Horse Agreement or, as the case may be, an agreement with the Prevailing Bidder, without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtor's business judgment. Moreover, all existing defaults either will be cured at Closing, or counter parties to assumed executory contracts will be provided with adequate assurance that any defaults will be promptly cured.

37. Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. <u>See</u> 11 U.S.C. § 365(1)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. <u>See</u>, <u>e.g.</u>, <u>In re Bygaph, Inc.</u>, 56 B.R. at 605-06 (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

38. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." <u>EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp.</u> (<u>In re Sanshoe Worldwide Corp.</u>), 139 B.R. 585, 592 (S.D.N.Y. Mar. 6, 1992) (citations omitted), <u>affd.</u> 993 F.2d 300 (2d Cir. 1993); <u>Carlisle Homes, Inc. v. Azzari</u> (<u>In re Carlisle Homes, Inc.</u>), 103 B.R. 524, 538 (Bankr. D.N.J. Dec. 30, 1988).

39.     Counterparties to the Assigned Contracts will have the opportunity to object to adequate assurance of future performance in accordance with the Bid Procedures Order. Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.  To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtor also requests that the order approving the sale of the Assets provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.   Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

40.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See e.g., Coleman Oil Co., Inc. v. The Circle K Corp., (In re Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), cert. denied, 522 U.S. 1148 (1998). Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the

contract or lease upon a proposed assumption or assignment thereof. See e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. Sept. 30, 1996) (section 365(f)(3) of the Bankruptcy Code prohibits - enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

41.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. See In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del. Mar. 6, 1998) ("In interpreting Section 365(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. Sept. 4, 1987). Thus, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## III.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

42.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after the entry of the order, unless

the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign and executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that any order approving the Stalking Horse Agreement or, as the case may be, a purchase agreement with the Prevailing Bidder, and assumption and assignment of the Assigned Contracts be effective immediately by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

43.     To maximize the value received for the Assets, the Debtor seeks to close the transaction as soon as possible after the Sale Hearing. Accordingly, the Debtor respectfully requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**IV.     Disclosure of "Extraordinary Provisions" in accordance with the Guidelines.**

44.     In accordance with the Guidelines, the following are "extraordinary provisions" of the 363 Sale to the Stalking Horse and the basis therefore.

45.     <u>Agreements with Management.</u>  Section 8 of the Stalking Horse Agreement requires that the employees listed on Schedule 8.8 have entered into employment agreements in forms satisfactory to the Stalking Horse (in its reasonable discretion).  These employees are Keng W. Lim, Vice President and Chief Marketing Officer of the Debtor, and Paul A. Butler, the Chief Operating Officer of the Debtor.  The parties to these employment agreements have not, as of the filing of this Motion, finalized terms.  As of the filing of this Motion, however, the Stalking Horse and Messrs. Butler and Lim have verbally agreed that each will enter into three year employment agreements for annual salaries of $150,000 per annum, which is the same as their current salaries.  The Debtor will make any final written employment agreements available

to any interested party upon request. To the extent that the Debtor enters into a purchase agreement with a Prevailing Bidder, other than the Stalking Horse, it may also contain a condition precedent regarding similar employment agreements.  These terms will also be disclosed and any written agreement that ensues will be provided to any party in interest that requests a copy.  Finally, the designee serving as the Stalking Horse is a Delaware company that was incorporated by Mr. Butler in 2009.  At closing, Mr. Butler will not own any stock or have any equity or debt interest in the Stalking Horse.

46.     <u>Tax Exemption.</u>  For the reasons discussed above, the sale order will provide that the Stalking Horse or Prevailing Bidder will not be responsible for any claims arising under any bulk sales or similar law or any tax statutes or ordinances, including without limitation, the Internal Revenue Code.

47.     <u>Record Retention.</u>  The Debtor proposes to sell all or substantially all of its assets to the Stalking Horse or Prevailing Bidder pursuant to this Motion; however, the Debtor will retain, or have reasonable access to, its books and records in order to administer this Case.

48.     <u>Findings as to Successor Liability.</u>  For the reasons discussed above, the Stalking Horse Agreement includes a provision requiring the Debtor to seek a sale order which includes, among other things, a finding that the Stalking Horse is not a successor in interest to the Debtor, and that the Debtor is seeking to sell the Assets free and clear of all liens, claims, encumbrances and without successor liability.

49.     <u>Waiver of Rule 6004(h).</u>  As set forth above, the Debtor is seeking waiver of the requirements of Rule 6004(h).

## **Summary**

50.     In summary, the Debtor will present, in conjunction with this Motion, evidence at the Sale Hearing to (i) support a finding that a sound business reason exists for the 363 Sale, (ii) support a finding that the Assets have been adequately marketed, (iii) demonstrate that fair and reasonable value will be received and the proffered purchase price for the Assets is the highest or best under the circumstances, and (iv) support a finding that the Debtor and the Stalking Horse or the Prevailing Bidder, as the case may be, have complied with Section 365 of the Bankruptcy Code.

## **No Prior Request**

51.     No prior motion for the relief requested herein has been made to this or any other court.

## **Notice**

52.     The Debtor has provided this Motion and notice of this Motion to: (i) the Office of the United States Trustee, (ii) the Stalking Horse, (iii) all parties who have expressed an interest in the Assets, (iv) the 2002 List, (v) all known creditors of the Debtor, (vi) EOT Lending Group, (vii) the New York State Public Service Commission and the Debtor's federal, state, and local regulatory and taxing authorities; (viii) all parties to executory contracts and unexpired leases that are anticipated to be assumed and assigned, or rejected, as part of the 363 Sale (collectively, the "Notice Parties"). The Debtor will provide notice of this Motion and the hearing on this Motion to all entities who are known to possess or assert a claim against the Debtor.  Notice of this Motion and any order entered hereon will be served in accordance with the Bankruptcy Rules, the Local Rules and/or the Guidelines. In light of the nature of the relief requested, the Debtor respectfully submit that no further notice is necessary.

## Conclusion

WHEREFORE, the Debtor respectfully requests that the Court enter (a) an order, the form of which is attached as Exhibit C, (i) approving the Stalking Horse Agreement between the Debtor and the Stalking Horse or, as the case may be, approving a sale agreement between the Debtor and the Prevailing Bidder, to acquire the Assets, (ii) authorizing the sale of the Assets free and clear of all claims and interests, (iii) authorizing the assumption and assignment of the Assigned Contracts to the Stalking Horse or the Prevailing Bidder; and (iv) granting such other and further relief as is just and proper under the circumstances.

Dated:  December 15, 2010

<div style="margin-left:40%;">

**BENESCH FRIEDLANDER**
**COPLAN & ARONOFF LLP**

By:     /s/ Raymond H. Lemisch
        Raymond H. Lemisch (RL5345)
        Michael J. Barrie (admitted *pro hac vice*)
        222 Delaware Avenue, Suite 801
        Wilmington, DE  19801
        (302) 442-7010  telephone
        (302) 442-7012  facsimile

        White Plains Center
        50 Main Street, Suite 1000
        White Plains, NY 10606

        *Counsel for Debtor and*
        *Debtor in Possession*

</div>