BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
Raymond H. Lemisch (RL5345)
Michael J. Barrie (admitted *pro hac vice*)
222 Delaware Avenue, Suite 801
Wilmington, DE  19801
(302) 442-7010  telephone
(302) 442-7012  facsimile

White Plains Center
50 Main Street, Suite 1000
White Plains, NY 10606

*Counsel for Debtor and Debtor in
Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

-------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| Empire One Telecommunications, Inc. | : | 10-10987 (ALG) |
| aka EOT, | : |  |
|  | : |  |
| Debtor. | : | EIN:  54-1963388 |

-------------------------------------------------------------x

**THE DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT
TO ACCOMPANY SECOND AMENDED PLAN OF LIQUIDATION**

---

**THE DEBTOR IN THIS CASE IS A SMALL BUSINESS.  AS A RESULT, THE DEBTOR IS PERMITTED TO DISTRIBUTE AND HAS DISTRIBUTED THIS DISCLOSURE STATEMENT BEFORE ITS FINAL APPROVAL BY THE COURT.  IF AN OBJECTION TO THIS DISCLOSURE STATEMENT IS FILED BY A PARTY IN INTEREST, FINAL APPROVAL OF THIS DISCLOSURE STATEMENT WILL BE CONSIDERED AT OR BEFORE THE HEARING ON CONFIRMATION OF THE PLAN**

## I.  INTRODUCTION

This is the second amended disclosure statement (the "Disclosure Statement") in the small business chapter 11 case of Empire One Telecommunications, Inc. (the "Debtor"), pending at Case No. 10-10987, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  This Disclosure Statement supercedes and replaces in its entirety the Disclosure Statement filed on September 23, 2010, and contains information about the Debtor and was prepared in conjunction with the second amended Plan of Liquidation (the "Plan") filed by the Debtor on January 26, 2011.  A full copy of the Plan is attached to this Disclosure Statement as Exhibit A.  Unless otherwise defined herein, all capitalized terms shall have the same meanings ascribed to them in the Plan.  ***Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one***.

The proposed distributions under the Plan are discussed at pages 11 - 12 of this Disclosure Statement. General unsecured creditors are classified in Class 3, and will receive an anticipated distribution of at least 5% of their Allowed Claims, in accordance with this Disclosure Statement and Plan.

The Plan contemplates the payment to creditors of the Debtor from the proceeds of the sale of all or substantially all of the Debtor's assets, liquidation of any remaining assets of the estate, and the proceeds of Litigation and Avoidance Actions in accordance with Section 7 of the Plan.

The Plan represents the effort of the Debtor to maximize the immediate cash distribution to holders of Claims.  With respect to holders of Claims entitled to vote, the Debtor believes that the Plan offers the highest, best and quickest recovery to holders of Claims entitled to distributions under the Plan.  **THE DEBTOR, THEREFORE, RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

### A.  Purpose of This Document

This Disclosure Statement describes:

- The Debtor and the significant events leading up to, and during the bankruptcy case;

- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed);

- Who can vote on or object to the Plan;

- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;

- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and

- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement in their entirety before voting on the Plan. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights. No statements or information concerning the Debtor or any entity described in this Disclosure Statement or Plan, particularly, but not limited to, the Debtor's profits, financial condition, assets or liabilities are authorized by the Debtor other than as set forth in this Disclosure Statement or the Exhibits hereto.

**B.     Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed by the Court.

**1.     Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan**

The Court has conditionally approved this Disclosure Statement pursuant to § 1125(f)(3) of the Bankruptcy Code. The hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take place on February 28, 2011, at 11:00 a.m. (Eastern Time), in Courtroom 617, with The Honorable Allan L. Gropper, U.S. Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408

**2.     Deadline For Voting to Accept or Reject the Plan**

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Debtor's counsel, Michael J. Barrie, Esquire, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware, 19801. See Article 4 below for a discussion of voting eligibility requirements.

**Your ballot must be received on or before February 26, 2011 or it will not be counted.**

All properly completed ballots received by Debtor's counsel before 5:00 p.m. (Eastern Time) on February 26, 2011 (the "Voting Deadline") will be counted in determining whether the Impaired Class entitled to vote on the Plan has accepted the Plan. All ballots received after the Voting Deadline will not be counted. All ballots must contain an original signature to be counted. No ballots received by facsimile or other electronic means will be accepted.

### 3. Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon (i) Debtor's counsel, Raymond H. Lemisch, Esquire, Benesch Friedlander, Coplan, & Aronoff LLP, White Plains Center, 50 Main Street, Suite 1000, White Plains, NY 10606, and Michael J. Barrie, Esquire, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware, 19801; (ii) the Debtor, attn: Paul Butler, Chief Operating Officer, Empire One Telecommunications, Inc., 55 Washington Street, Suite 901, Brooklyn, NY 11201; and (iii) the United States Trustee, 33 Whitehall Street 21st Floor, New York, NY 10004, so that the same are received on or before 5:00 p.m. (Eastern Time) on February 26, 2011.

### 4. Identity of Person to Contact for More Information

All correspondence in connection with voting on the Plan, or if you want additional information about the Plan, should be directed to Debtor's counsel, Michael J. Barrie, Esquire, Benesch, Friedlander Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801.

### 5. Disclaimer

*The Court has conditionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan. Objections to the adequacy of this Disclosure Statement must be filed on or before February 26, 2011.*

*This Disclosure Statement and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes to accept the Plan. No representations have been authorized by the Bankruptcy Court concerning the Debtor, its business operations or the value of its assets, except as explicitly set forth in this Disclosure Statement.*

*Please refer to the Plan (or, where indicated, certain motions filed with the Court) for definitions of the capitalized terms used in this Disclosure Statement.*

*Except as otherwise indicated, the statements in this Disclosure Statement are made as of January 28, 2011, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any time after such date.*

*You should not construe this Disclosure Statement as providing any legal, business, financial or tax advice. You should consult with your own legal, business, financial and tax*

*advisors as to any matter in connection with the Plan, the solicitation of votes on the Plan and the transactions contemplated by the Plan.*

## II.    GENERAL INFORMATION

### A.    Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business and affairs for itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to distributions of the value of a debtor's assets.

The commencement of a chapter 11 case creates a bankruptcy estate that is comprised of all of the legal and equitable interests of a debtor as of the commencement date of the chapter 11 case.  The Bankruptcy Code provides that a debtor may continue to operate its business and affairs and remain in possession of its property as a "debtor-in-possession".

The consummation of a plan is the fundamental objective of a chapter 11 reorganization case.  A plan sets forth the means for satisfying claims against and interest in a debtor. Confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor.  Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan may provide for the liquidation of the debtor.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  The Debtor is submitting this Disclosure Statement to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

### B.    Description and History of the Debtor's Business

The Debtor is a corporation which was organized under the laws of the State of Delaware on October 26, 1999.  Prior to the Petition Date, the Debtor provided telecommunications services to its customers.   The Debtor has continued to provide such services since the Petition Date.  The Debtor is a competitive local exchange carrier, per the Telecommunications Act of 1996, and provides various wholesale/retail communications services, including standard voice telecommunications (local, long distance, and wireless), Internet access, and specialized data services for commercial subscribers.  The Debtor serves customers in the United States, Asia, and other markets, maintains Web portals in multiple languages, and provides marketing, sales, and customer services in target markets.

The Debtor derives revenues from, *inter alia*, access billing, whereby the Debtor receives a per-minute fee for each call routed through its network. To collect these revenues, the Debtor invoices other telecommunications' providers (the "Carriers"), and obtains the Carriers' data on the number and attributes of calls routed through the Debtor's network.

On April 2, 2001, the Debtor, together with its then-existing subsidiaries, filed a voluntary Chapter 11 petition (the "First Bankruptcy Case"). Pursuant to a plan of reorganization confirmed in the First Bankruptcy Case, all of the Debtor's then-existing affiliates were dissolved and the Debtor reorganized. In addition, under the confirmed plan of reorganization in the Debtor's First Bankruptcy Case, EOT Lending Corp. received ninety percent (90%) of the shares of the Debtor and Quantrant Management Corp. received ten percent (10%) of the shares of the Debtor. The Plan in the First Bankruptcy Case also provided that EOT Lending Corp. would distribute twenty (20) percent of the total shares of the Debtor to the Debtor's management. The Debtor confirmed a plan in the First Bankruptcy Case on December 5, 2002, and on June 30, 2005, the bankruptcy court entered a final decree.

As of the Petition Date, the Debtor employed approximately 26 employees. The Debtor has not reduced its workforce during the course of this bankruptcy case. The Debtor anticipates that many of its employees may be employed by the purchaser ("Purchaser") of substantially all of the Debtor's assets (the "Sale"), as described in Article 3D of the Disclosure Statement and Section 7 of the Plan. However, to the extent that such employees are not employed by the Purchaser subsequent to Closing, the Debtor intends to reduce its workforce as part of the liquidation ("Liquidation") of the Debtor's estate.

### C.    Insiders of the Debtor

The following individuals are considered insiders of the Debtors as defined in § 101(31) of the United States Bankruptcy Code: Alan Quasha, Sherry Shen, Paul Butler, and Keng Lim. The Debtor has a two-member board of directors (the "Board"), comprised of Alan Quasha and Sherry Shen. Mr. Quasha is the president of EOT Lending Corp. ("EOT Lending"), the Debtor's pre-petition lender and largest shareholder. EOT Lending's loan to and unsecured claim against the Debtor arose in connection with a debtor-in-possession loan and exit loan extended in the Debtor's previous bankruptcy case. Ms. Shen is an agent for EOT Lending and also serves as the Debtor's chief executive officer ("CEO"), but has no role in the Debtor's day-to-day business operations. Neither Mr. Quasha nor Ms. Shen receives compensation from the Debtor.

### D.    Management of the Debtor Before and During the Bankruptcy

During the two years prior to Petition Date, the officers, directors, managers or other persons in control of the Debtor (collectively the "Managers") were Paul Butler, Chief Operating Officer and Keng W. Lim, Chief Marketing Officer. As set forth above, neither Mr. Quasha nor Ms. Shen were or are involved in the day-to-day operations of the Debtor. The Managers of the Debtor during the Debtor's chapter 11 case have been Paul Butler and Keng Lim. There has been no change in management during the course of the bankruptcy case. The Debtor will identify a Chief Liquidation Officer in the Plan Supplement, who primarily will be responsible for the Liquidation and responsibilities of the reorganized Debtor under the Plan.

### E.  Events Leading to Chapter 11 Filing

The Debtor filed a voluntary bankruptcy petition on February 25, 2010 (the "Petition Date").  The filing of the voluntary bankruptcy petition was necessitated by the Debtor's multiple, ongoing billing disputes with several of its Carriers.  Due to these billing disputes, the Debtor has been unable to fully collect outstanding receivables from certain carriers.  These disputes ultimately led to the Debtor's Chapter 11 filing.  The Debtor has continued to manage its property and operate its business as a debtor-in-possession in accordance with §§ 1107 and 1108 of the Bankruptcy Code.

### F.  Significant Events During the Bankruptcy Case

As discussed above, the Debtor has continued to manage its property and operate its business as a debtor-in-possession since the Petition Date.

### 1.  Debtor's Professionals

The following parties have been employed by the Debtor during the course of this bankruptcy case: (i) Debtor's counsel – the Debtor originally was represented by Alex Vinnisky, Esquire.  On July 7, 2010, Benesch, Friedlander, Coplan & Aronoff LLP substituted in as the Debtor's bankruptcy counsel, effective May 24, 2010, and has continued to represent the Debtor since such time; (ii) Debtor's accountant - On May 20, 2010, the Court entered an order authorizing the employment of Susan King & Company, LLC as Accountants to the Debtor, Nunc Pro Tunc to the Petition Date.  Ms. King has assisted in the Debtor's bankruptcy case and has prepared all of the Debtor's monthly operating reports to date, as well as providing additional tax and accounting related services as necessary; (iii) Debtor's other professionals - On April 19, 2010, the Court entered an order authorizing the retention of Goldberg & Rimberg, PLLC as Special Counsel, Nunc Pro Tunc to the Petition Date.  Goldberg & Rimberg serves as the Debtor's general litigation counsel in connection with the Carrier Disputes and such other litigation matters that may arise during the course of the bankruptcy case as discussed in the Plan; and (iv) On November 17, 2010, the Court entered an order authorizing the employment of Phoenix Capital Resources ("Phoenix Capital Resources") as the Debtor's investment banker.

### 2.  Significant Events

The following is a list of significant events that occurred during the course of the Debtor's bankruptcy:

#### a.  Compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules and United States Trustee Deadlines

On March 11, 2010, the Debtor filed its Statement of Financial Affairs and Schedules of Assets and Liabilities ("Schedules and Statements").  The Schedules and Statements have subsequently been amended by the Debtor.  The Schedules and Statements are viewable at the Clerk of the Court, US Bankruptcy Court for the Southern District of New York, Manhattan Office, One Bowling Green, New York, NY 10004 and https://ecf.nysb.uscourts.gov/cgi-bin/login.pl.  The Debtor may amend its Schedules and Statements subsequent to the filing of

this Disclosure Statement.  To the extent that the Debtor amends its Schedules and Statements, the Debtor will provide notice of the amendments to the affected creditors.  On April 6, 2010, the Office of the United States Trustee conducted a meeting pursuant to § 341 of the Bankruptcy Code.  The Debtor has filed all monthly operating reports through November 2010 and will continue to do so during the remainder of the bankruptcy case.  To the best of the Debtor's knowledge, information and belief, the Debtor has complied with all other applicable requirements of the Bankruptcy Code and Bankruptcy Rules, as well as local Bankruptcy Court rules and deadlines of the Office of the United States Trustee.

**b.      Asset sales outside the ordinary course of business, debtor in possession financing, or cash collateral orders**

Since the Petition Date, the Debtor and its advisors have explored various restructuring alternatives, including the sale of all or specific portions of the Debtor's operations.  The Debtor's investment banker, Phoenix, conducted an expansive marketing campaign in connections with the Sale(s) of substantially all of the Debtor's assets outside of the ordinary course of business.  The Sale is discussed in detail at Article III D with regard to implementation of the Plan.

The Debtor has been operating on its own cash flow during the course of the bankruptcy case and has neither entered into a cash collateral order nor debtor-in-possession financing.  No creditor holds a lien on the Debtor's cash.

**c.      Pending Litigation**

Prior to the filing of the Disclosure Statement, the Debtor commenced an adversary proceeding, Empire One Telecommunications, Inc. a/k/a *EOT, Inc. v. T-Mobile USA, Inc*. ("T-Mobile"), Adv. No. 10-04234 (ALG), which complaint seeks to recover approximately $1,500,000 in connection with services that the Debtor provided to T-Mobile.  That dispute deals with T-Mobile's use of the Debtor's network without compensating the Debtor.  T-Mobile filed a motion to dismiss this adversary proceeding.  The Debtor intends to file opposition in February 2011.  Litigation of the Carrier Disputes, which includes the adversary proceeding pending against T-Mobile, will be handled by the Debtor's special counsel, Goldberg & Rimberg, PLLC.

**d.      Pending State Court Litigation**

The Debtor's Statements and Schedules disclose several prepetition lawsuits.  The lawsuits were stayed by the filing of the bankruptcy petition.  One such cause of action was commenced by the Debtor against Verizon and deals with insufficient call records.  In this action, the Debtor contends that it was required to purchase call records from Verizon.  The information contained in these call records would allow the Debtor to bill other carriers for traffic those carriers routed through the Debtor's network.  In the action, the Debtor alleges that Verizon intentionally or recklessly manipulated the data contained in these call records making them unusable to the Debtor.  As a result, the Debtor could not bill other carriers for "traffic" routed through its network, thus costing the Debtor millions of dollars in damages.  The Debtor

and Verizon are currently in discussions in an attempt to globally and amicably resolve this and other disputes.

### G. Projected Recovery of Avoidable Transfers

The Debtor intends to pursue preference, fraudulent conveyance, or other avoidance actions. While the results of litigation cannot be predicted with certainty and it is possible that other causes of action may be identified, and the Debtor has not yet completed its investigation, the list of transfers, including the amount of such transfers, within ninety days of the Petition Date, are attached to the Debtor's Schedules and Statements and may compromise the scope of potential actions. If you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtor may seek to avoid such transfer.

### H. Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article IX of the Plan.

### I. Retention and Preservation of Claims Objections and Causes of Action

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation Order, the Debtor's right to object to all Claims and Interests asserted against them and all of the Debtor's Causes of Action, including without limitation, preference actions, fraudulent conveyances actions, avoidance actions, the Carrier Disputes, and all other Claims and Causes of Action that the Debtor holds preconfirmation, including, but not limited to, Claims for unpaid accounts receivable shall vest in the reorganized Debtor. A list of the Debtor's Causes of Action will be included in the Plan Supplement.

Unless a Claim or Cause of Action against a Creditor or other entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtor expressly reserves such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Debtor may presently be unaware or which may arise or exist by reason or additional facts or circumstances unknown to the Debtor at this time or facts or circumstances which may change or be different from those which the Debtor now believe to exist), and therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel, (judicial, equitable or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan or any other Final Order.

BECAUSE THE DEADLINE UNDER THE PLAN FOR OBJECTING TO CLAIMS IS AFTER THE DATE ON WHICH VOTING ON THE PLAN WILL BE CONCLUDED, CREDITORS SHOULD NOT RELY UPON THE ABSENCE OF AN OBJECTION TO THEIR PROOF OF CLAIM OR INTEREST IN DETERMINING WHETHER TO VOTE TO ACCEPT

OR REJECT THE PLAN, OR AS AN INDICATION THAT THE DEBTOR OR ANY OTHER PARTY-IN-INTEREST WILL NOT OBJECT TO THE AMOUNT, PRIORITY, SECURITY OR ALLOWABILITY OF SUCH CLAIMS OR INTERESTS.  ANY CLAIM MAY BE SUBJECT TO AN OBJECTION AND THE DEBTOR RESERVES ALL RIGHTS TO RAISE ANY AND ALL OBJECTIONS TO CLAIMS.

### J.      Current and Historical Financial Conditions

The identity of the assets of the Debtor's estate are listed in the Asset Purchase Agreement.  Given the extensive marketing campaign undertaken by the Debtor's investment banker, the Debtor believes that the going concern value of its assets total $800,000, the consideration to be paid under the Asset Purchase Agreement.

Copies of the Debtor's monthly operating reports filed since the commencement of the Debtor's bankruptcy case are available at https://ecf.nysb.uscourts.gov/cgi-bin/login.pl.   The Debtor intends to continue to file its monthly operating reports through the remainder of the bankruptcy case.

### III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

THE FOLLOWING DISCUSSION OF THE PLAN CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF. YOU SHOULD READ THE PLAN BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  CHANGES MAY BE MADE TO THE PLAN.  ANY SUCH CHANGES MADE TO THE PLAN WILL BE DESCRIBED AT THE CONFIRMATION HEARING.  A copy of the Plan is attached as Exhibit A to this Disclosure Statement.

### A.      What is the Purpose of the Plan of Reorganization?

As required by the Bankruptcy Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.      Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Debtor has not placed the following claims in any class:

#### 1.      Administrative Expenses

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20

days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment. The Plan provides that, except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtor shall pay to each holder of an Allowed Administrative Expense Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim. Holders of Administrative Expense Claims shall file a request for allowance and payment in accordance with Section 3.02 of the Plan. The Debtor estimates that Allowed Administrative Expense Claims will total approximately $450,000 - $500,000.

Post-confirmation Expenses shall be paid according to terms agreed to by the Debtor without prior approval of the Bankruptcy Court from the Post-Confirmation Reserve as set forth in Section 3.02 of the Plan.

## 2.     Priority Tax Claims

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtor shall pay each holder of an Allowed Priority Tax Claim an amount in Cash equal to the Allowed amount of such Allowed Priority Tax Claim. The Debtor estimates that the Allowed Priority Tax Claims will total approximately $200,000.

## 3.     United States Trustee Fees

All United States Trustee Fees will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Bankruptcy Code.

## C.     Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

Claims and Equity Interests shall be entitled to vote on the Plan as follows:

| Class | Estimated Total Amount of Allowed Claims | Estimated Distribution | Recovery | Impairment | Entitled to Vote |
|---|---|---|---|---|---|
| Class 1 – Priority Non-Tax Claims | $20,000 | $20,000 | 100% | Unimpaired | No. Deemed to Accept. |
| Class 2 – Secured Claim of 55 Washington Street LLC | $ 0 | $ 0 | 100% | Unimpaired | No. Deemed to Accept. |
| Class 3 – Unsecured Claims | $3,000,000 | $150,000 - $450,000 | Estimated 5% - 15% | Impaired | Yes. |
| Class 4 – Equity Interests | N/A | $ 0 | 0% | Impaired | No. Deemed to Reject. |

Class 1 – Priority Non-Tax Claims. Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtor agrees to a different treatment of such Claim, each holder of an Allowed Priority Non-Tax Claim shall receive the unpaid amount of its Allowed Priority Non-Tax Claim on the Effective Date, or as soon thereafter as is practicable in full satisfaction of such Claim.

Class 2 – Secured Claim of 55 Washington Street LLC.  Under the terms and conditions of the Asset Purchase Agreement, by and between the Debtor and Purchaser, the obligations of the Debtor to 55 Washington Street LLC will be assumed and assigned to Purchaser at closing. Accordingly, Washington Street LLC will not receive any distribution under this Plan, but any amount necessary to cure prepetition monetary defaults will be paid by Purchaser (as defined herein.)

Class 3 - Unsecured Claims. The holders of Allowed Unsecured Claims shall receive their Pro Rata Share of all remaining Cash after payment in full of all Allowed Administrative Expense Claims, all Allowed Priority Tax Claims, all Priority Non-Tax Claims, and the Post-Confirmation Reserve, through multiple distributions, the first of which shall occur before sixty (60) days after the later of the closing of the Asset Purchase Agreement or the Effective Date. The Debtor estimates that $150,000 to $450,000 will be available for distribution to holders of Allowed General Unsecured Claims from the following sources:  (i) the proceeds from the Sale; (ii) the proceeds from litigation pending against T-Mobile; and (iii) the proceeds from the Avoidance Actions.

Class 4 – Equity Interests. All Equity Interests issued by the Debtor shall survive entry of the Confirmation Order.  However, each holder of an Equity Interest shall neither receive nor

retain any property or interest in Estate Property on account of such Equity Interest. Equity Interest holders are enjoined from taking actions detrimental to the liquidation of the Debtor's estate, taking actions contrary to the terms of the Plan, and taking actions that would impede the implementation of the provisions of the Plan in any way. Those holding Equity Interests are also enjoined from transferring such Equity Interests. In accordance with Section 4.05 of the Plan, all Equity Interests will be cancelled after the Plan has been fully implemented and the Debtor files the appropriate articles of dissolution.

### D. Plan Implementation

#### 1. Sale of Substantially all of the Debtor's Assets

##### a. Marketing of the Debtor's Assets

During the course of the Debtor's bankruptcy case, the Debtor has marketed its assets to several potential interested bidders. The Debtor engaged Phoenix Capital Resources as an investment banker for the purpose of assisting it in identifying a possible acquirer for the sale of substantially all of the Debtor's assets. Although the Debtor had attracted several parties interested in the Sale, no formal bids were received in accordance with the Bid Procedures Motion, and as such, the Debtor proceeded with the Sale to the Purchaser – the stalking horse under the Sale Motion – as described herein.

##### b. Bid Procedures and Auction

The Debtor filed the Bid Procedures Motion in connection with a sale of substantially all of the Debtor's assets. The Bid Procedures Motion was granted by the Bankruptcy Court on October 27, 2010, which approved certain parameters for the sale and auction process in accordance with the Court's General Order M-383. After the marketing of the Debtor's assets, no qualified bids were received in accordance with the order approving the Bid Procedures Motion, and as such no auction was conducted. The Debtor is proceeding with a sale of substantially all of its assets to the Purchaser. The Asset Purchase Agreement contemplates that the Debtor's estate will receive (i) payment in the sum of $800,000; and (ii) assumption of certain pre and post petition liabilities up to $600,000 (but not exceeding more than $400,000 at closing).

##### c. Sale Hearing and Closing of Sale

The Sale Hearing occurred on January 19, 2011, at which the Court granted an order approving the sale of substantially all of the Debtor's assets to Media 3 Communications, Inc., (the "Purchaser"). A copy of the Sale Order is attached hereto as Exhibit B. Pursuant to the Sale Order, the Debtor and Purchaser are permitted to close on the Sale pursuant to the terms of the Asset Purchase Agreement. The Sale Order authorizes a sale, free and clear of all Liens, claims, and encumbrances, of substantially all of the Debtor's assets under sections 105, 363, and 365 of the Bankruptcy Code under the terms and conditions of the Asset Purchase Agreement entered into between the Debtor and the Purchaser. Pursuant to the Sale Order, the Debtor is be authorized to take any and all actions necessary to consummate the Sale. The Sale shall be deemed incorporated and included in the Plan if the Plan is confirmed and effective prior to the

closing of the Sale. Otherwise, the Sale will be effective upon closing, which will occur after Purchaser receives certain necessary regulatory approvals.

The Debtor also may liquidate any Excluded Assets not sold under the Asset Purchase Agreement. The Confirmation Order shall authorize the Debtor to sell, free and clear of all Liens, claims, and encumbrances under sections 365, 1123(b)(4), 1129(b)(2)(A), 1145 and 1146(a) of the Code, any Excluded Assets. All sales pursuant to Section 7.02 of the Plan for which the Debtor seeks to sell an Excluded Asset valued, in the Debtor's reasonable opinion, to be equal to or less than $50,000 shall be authorized by the Confirmation Order without further order of the Bankruptcy Court. Sales of Excluded Assets valued, in the Debtor's reasonable opinion, in excess of $50,000 shall be authorized upon prior approval of the Bankruptcy Court. The Debtor is unaware of any such assets.

### d. Use of Sale Proceeds

Proceeds of the Sale shall be deposited into the Liquidation Account for distribution in accordance with this Plan. The solicitation of votes on the Plan shall be deemed a solicitation of the holders of Claims for the approval of the liquidation of any Excluded Assets not sold under the Asset Purchase Agreement. Entry of the Confirmation Order shall constitute approval of such agreements and transactions and the Confirmation Order shall so provide.

### e. Dissolution of the Debtor.

Within thirty (30) days of all acts to be completed under the Plan are completed, or as soon as is reasonably practical thereafter, the Debtor shall be deemed dissolved in accordance of Section 7.08 of the Plan.

### E. Risk Factors

The proposed Plan has the following risks:

HOLDERS OF IMPAIRED CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THOSE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 1. Parties-In-Interest May Object to the Debtor's Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code.

However, the Debtor cannot give assurances that the Bankruptcy Court will reach the same conclusion.

### 2. The Debtor May Not Be Able to Secure Confirmation of the Plan.

The Debtor cannot assure you that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, the Debtor cannot assure you that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity security holder of the Debtor might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distribution to non-accepting holders of claims and interest within a particular class under the Plan will not be less that the value of distributions such holders would receive if the Debtor were to liquidate under chapter 7 of the Bankruptcy Code. While the Debtor cannot give assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtor believes that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

The confirmation and consummation of the Plan are also subject to certain conditions, including, but not limited to, the sale and closing on a sale of all or substantially all of the Debtor's assets. If the Plan is not confirmed and an alternative plan could not be agreed to, it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.

### 3. The Debtor May Object to the Amount or Classification of Your Claim.

The Debtor reserves the right to object to the amount or classification of any Claim or Interest. The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim or Interest is subject to an objection. Any such Claim or Interest holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### 4. Conditions Precedent to the Plan's Effective Date May Not Occur.

The Debtor cannot assure that the Plan will become effective. Specifically, a condition to the Effective Date under the Plan requires that a closing will occur under the Asset Purchase Agreement. A closing under the Asset Purchase Agreement may not occur for various reasons including, *inter alia*, the failure of the Purchaser to obtain certain necessary regulatory approvals and/or licenses, the failure of the parties under the Asset Purchase Agreement to perform their respective obligations, or the failure of the Purchaser to obtain financing.

## 5.    The Debtor May Not Recover Proceeds In Litigation.

The Debtor cannot guarantee that it will receive the projected recovery in the litigation against T-Mobile or in the Avoidance Actions.

### F.    Executory Contracts and Unexpired Leases

Certain executory contracts and unexpired leases of the Debtor will be assumed and assigned to Purchaser pursuant to the Asset Purchase Agreement.  The procedures relating to the assumption of executory contracts and unexpired leases for non-residential real property, including procedures relating to the filing of objections to proposed cure amounts and adequate protection of future performance, were set forth in the Court's order granting the Bid Procedures Motion.  The procedures for the rejection of executory contracts and unexpired leases (that are not affected by the Sale) are set forth in Section 6.01 of the Plan.

Assumption means that the Debtor, or in this case, the Purchaser has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.

All executory contracts and unexpired leases that have not been identified as to be assumed by the Purchaser will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

***The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Will Be Set Forth in the Confirmation Order and Notice of Such Rejection and Claim Filing Deadline Will be Served on Any Affected Party.***  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### G.    Tax Consequences of Plan

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

The following discussion summarizes certain material United States federal income tax ("Federal Income Tax") consequences of the Plan to certain holders of Allowed Claims (the "Creditors") and the Debtor. This discussion does not address the Federal Income Tax consequences to: (i) Creditors whose claims are entitled to payment in full in cash, or are otherwise unimpaired under the Plan; and (ii) holders of equity interests or claims that are extinguished without a distribution. This discussion is based upon existing provisions of the Tax Code, Treasury regulations promulgated thereunder, judicial authorities and current administrative rulings and practices now in effect. No assurance can be given that future legislation, regulations, administrative pronouncements and/or judicial decisions will not change applicable law and affect the analysis described herein. Any such change could be applied retroactively in a manner that would adversely affect the creditors and the Debtor.

The Federal Income Tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. Counsel for the Debtor has not sought and will not seek any rulings from the Internal Revenue Service ("IRS") with respect to the Federal Income Tax consequences discussed below. Although the discussion below represents the best judgment as to the matters discussed herein, it does not in any way bind the IRS or the courts or in any way constitute an assurance that the Federal Income Tax consequences discussed herein will be accepted by the IRS or the courts.

The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or creditors and the discussion does not address the tax consequences of the Plan to certain types of creditors (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN WITH RESPECT TO THE DEBTOR OR THE HOLDERS OF ANY CLAIMS OR EQUITY INTERESTS, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN IN GENERAL AND IN PARTICULAR, THE TIMING, CHARACTER AND AMOUNTS OF INCOME, GAIN, LOSS, DEDUCTION, CREDIT OR CREDIT RECAPTURE TO BE RECOGNIZED, AND ANY PROCEDURAL REQUIREMENTS WITH WHICH THE HOLDER MUST COMPLY.

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT, UNLESS EXPRESSLY STATED OTHERWISE, ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

## 1. Certain Material United States Federal Income Tax Consequences to the Debtor

The Debtor does not believe that there will be any material United States federal income tax consequences to the Debtor as a result of the implementation of the Plan.

## 2. Certain Material United States Federal Income Tax Consequences to Holders of Claims

### a. General

The tax treatment of holders of claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (i) whether the Claim (or any portion thereof) constitutes a Claim for principal or interest; (ii) the type and classification of consideration received by the holder in exchange for the Claim; (iii) whether the holder is a resident of the United States for tax purposes (or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above); (iv) the manner in which a holder acquired a Claim; (v) the length of time the Claim has been held; (vi) whether the claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; and (x) whether the claim is an installment obligation for United States federal income tax purposes. Therefore, holders of Claims should consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

A holder of a Claim should generally recognize a gain (or loss) to the extent that the amount realized under the Plan in respect of the Claim exceeds (or is exceeded by) the holder's tax basis in the Claim. The holder's amount realized for this purpose will generally equal the amount of Cash the holder receives under the Plan in respect of its Claim. The timing and amount of income, gain or loss recognized as a consequence provided for by the Plan will depend on, among other things, whether the holder of a Claim receives multiple distributions pursuant to the Plan and whether the Debtor's obligation to make such payments is treated as a new debt for United States federal income tax purposes. Gain or loss may not currently be recognized if the property received does not have an ascertainable fair market value.

### b. Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the Bankruptcy Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder: (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Holders of Claims that are non-United States Persons and that receive payments or distributions under the Plan will not be subject to backup withholding, provided that such holders furnish certification of their status as non-United States Persons (and furnish any other required

certification), or are otherwise exempt from backup withholding. Generally, such certification is provided on IRS Form W-8BEN.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTOR MAKES THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Bankruptcy Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are <u>not</u> the only requirements for confirmation.

### A.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Debtor believes that Class 3 is impaired and that holders of claims in this class are therefore entitled to vote to accept or reject the Plan. The Debtor believes that Classes 1 and 2 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.  The Debtor believes that Class 4 is impaired and will receive no distribution under the Plan and is deemed to reject.

**B.      What Is an Allowed Claim or an Allowed Equity Interest?**

Only a creditor or Equity Interest holder with an Allowed Claim or an Allowed Equity Interest has the right to vote on the Plan. Generally, a Claim or Equity Interest is allowed if either (1) the Debtor has scheduled the Claim on the Debtor's schedules, unless the Claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or Equity Interest. When a Claim or Equity Interest is not allowed, the creditor or Equity Interest holder holding the claim or Equity Interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or Equity Interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

> *The deadline for filing a proof of claim in this case was fixed by an Order entered in connection with the Debtor's Motion to Approve a Bar Date.  The deadline for filing a proof of claim was December 15, 2010.*

**C.      What Is an Impaired Claim or Impaired Equity Interest?**

As noted above, the holder of an Allowed Claim or Equity Interest has the right to vote only if it is in a class that is impaired under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 1.      Who is **NOT** Entitled to Vote

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of Claims and Equity Interests that have been disallowed by an order of the Court;

- holders of other Claims or Equity Interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of Claims or Equity Interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of Claims or Equity Interests in classes that do not receive or retain any value under the Plan;

- holders of claims for administrative expenses.

*Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.*

### 2. Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a Secured Claim and in part as an Unsecured Claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### D. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed below.

### E. Votes Necessary for a Class to Accept the Plan

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### F. Treatment of Nonaccepting Classes

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Bankruptcy Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Bankruptcy Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Bankruptcy Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

### G. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached hereto as <u>Exhibit C</u>.

### H. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

## 1. Ability to Initially Fund Plan

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. The sources of the cash on hand as of the Effective Date will be the amount contained in the Debtor's operating account and the proceeds from the Sale.

## 2. Ability to Make Future Plan Payments And Operate Without Further Reorganization

The Debtor will have enough cash over the life of the Plan to make the required Plan payments.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

## V. EFFECT OF CONFIRMATION OF PLAN

### A. NO DISCHARGE OF DEBTOR

In accordance with § 1141(d)(3) of the Bankruptcy Code, the Debtor will not receive any discharge of debt in this bankruptcy case.

### B. Modification of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

### C. Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

Dated: January 28, 2011

/s/ *Paul Butler*
Paul Butler, Chief Operating Officer, Debtor

/s/ *Michael J. Barrie*
Michael J. Barrie, Esquire, Counsel for the Debtors